**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| TOWN OF<br>NEW WINDSOR, | * | |
| | * | |
| *Plaintiff* | | CIVIL ACTION NO.  1:26-cv-02277 |
| | * | |
| v. | | |
| | * | |
| PSEG RENEWABLE | | |
| TRANSMISSION LLC, *et al.*, | * | |
| | | |
| *Defendants.* | * | |

*    *    *    *    *    *    *    *    *    *    *    *    *

**COUNTERCLAIM**

Defendant/Counter-Petitioner, PSEG Renewable Transmission LLC ("PSEG Renewable Transmission," the "Company," or the "Petitioner"), pursuant to Md. Code Ann., Real Property ("RP") § 12-111, seeks an order authorizing the Company to enter onto property owned by Plaintiff/Counter-Respondent Town of New Windsor (the "Town").

**Nature of the Action**

1.      PJM Interconnection, LLC ("PJM"), the independent regional transmission organization approved and regulated by the Federal Regulatory Energy Commission ("FERC"), coordinates the transmission of electricity through all or parts of a 13-state region that includes Delaware, Illinois, Indiana, Kentucky, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, the District of Columbia, as well as Maryland. Among other things, PJM is responsible for maintaining a safe and reliable electric transmission system in that region.  In accordance with the authority granted to it by FERC, PJM has directed the Company to construct an approximately 67-mile 500 kilovolt ("kV") transmission line that will traverse portions of Baltimore, Carroll, and Frederick Counties.  The project is known as the Maryland Piedmont Reliability Project ("MPRP").  The MPRP is needed to prevent serious

1

reliability violations from occurring on the region's electric grid.  Specifically, PJM forecasts that the regional transmission system could experience blackouts and voltage collapse conditions unless the MPRP is constructed by June of 2027.  As a result, PJM and the Company have executed a Designated Entity Agreement ("DEA"), which has been accepted by FERC and obligates the Company to take reasonable efforts to ensure that it obtains all necessary authorizations and permits to construct and place the MPRP in service by June 1, 2027.

2.	To meet these obligations, on December 31, 2024, the Company filed an application for a Certificate of Public Convenience and Necessity ("CPCN") with the Maryland Public Service Commission (the "PSC").  The PSC is the state agency with siting authority over the alignment and construction of transmission lines in Maryland.  The Company's application is now pending as Case No. 9773 before the PSC.  The proposed route for the MPRP, as contained in the Company's CPCN application, traverses a property owned by the Town

3.	The Power Plant Research Program ("PPRP") is a division of the Maryland Department of Natural Resources ("DNR").  PPRP's statutory duty in CPCN proceedings is to analyze on behalf of several Maryland state agencies (the "State Agencies") the environmental and socioeconomic impacts of proposed electric generation stations and high voltage transmission lines.  *See* Md. Code Ann., Nat. Res. ("NR") § 3-306.  Following this analysis, PPRP makes a recommendation to the PSC regarding the proposed alignment and its impacts.  To conduct its evaluation of the environmental issues associated with the MPRP, the State Agencies, through PPRP, are requiring that the Company conduct several field measured surveys and obtain environmental information from applicable properties, including the Town's property, along the proposed route for the MPRP.  Specifically, the State Agencies have requested certain field-based investigations associated with the Town's property be obtained, including: metes and bounds

2

surveys, wetlands delineations, forest stand delineations, and inspections relating to the possible disturbance to sensitive species of concern and resources of historic value that the transmission line might cause.

4.      On September 11, 2025, the PSC entered an order setting a procedural schedule (the "Procedural Schedule") that establishes the procedures for the review of the Company's application.  Therein, the PSC stated that PPRP cannot "perform its statutorily required evaluation" of the Company's application "without the required field studies."  (Declaration of Dawn Shilkoski ("Shilkoski Decl."), Ex. 8.)

5.      In order for the Company's CPCN application to move forward according to the Procedural Schedule, these surveys must be completed as soon as possible.

6.      Despite the Company's real and bona fide efforts to obtain Respondents' voluntary consent to enter their properties, the Town has refused permission to the Company to enter their properties for the limited purpose of conducting these field surveys that the State Agencies are requiring to evaluate any potential environmental impacts of the proposed MPRP.  As a result, the Company seeks an order pursuant to RP § 12-111 so that it may enter the Town's property, conduct the requisite surveys and inspections, and obtain the information required by the State Agencies in order for PPRP to submit its recommendation to the PSC regarding the CPCN.

### Parties

7.      The Company is a transmission development company.  It is a Delaware limited liability company with its principal place of business located at 80 Park Plaza, Newark, New Jersey 07102.  The Company's sole member is PSEG Renewable Ventures LLC, also headquartered in New Jersey.  The sole member of PSEG Renewable Ventures LLC is PSEG Energy Holdings L.L.C., also headquartered in New Jersey.  The sole member of PSEG Energy Holdings L.L.C. is

Public Service Enterprise Group, Inc. ("PSEG"), a diversified energy company headquartered in Newark, New Jersey that, through its subsidiary, Public Service Electric and Gas Company, provides electric and gas services to millions of residential and commercial customers and owns and maintains 834 miles of transmission rights of way.

8.      The Town is a municipal corporation located in Carroll County, Maryland.

## Jurisdiction and Venue

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy, excluding costs and interest, exceeds $75,000, and complete diversity of citizenship exists between the parties.

10.      This Court has personal jurisdiction over the Town because it is domiciled in Maryland and because it has an interest in property in Maryland that is the subject of this suit.

## Factual Background

11.      The Company was created in 2021 to develop, construct, and own transmission projects.

12.      The Company is currently developing the MPRP.  The MPRP is a new greenfield overhead 500 kV electric transmission project that PJM is requiring the Company to construct by June 2027 to maintain the safe and reliable operation of the region's electric transmission system that serves Maryland and surrounding states.  The route of the MPRP is slated to traverse the Town's property, and PSEG will ultimately need to acquire property rights in the Town's property to construct the MPRP.

13.      PJM is the regional transmission organization responsible for operating and planning the high-voltage electricity grid for 13 states in the region, including Maryland. (Shilkoski Decl. ¶ 8.)  Under the Federal Power Act, 16 U.S.C. § 791a, *et seq.*, Congress provided

FERC with broad powers and authority to regulate "the transmission of electric energy in interstate commerce." 16 U.S.C. § 824(a). FERC has, in turn, charged PJM with planning the electric transmission system for its region. *See* FERC Order No. 1000, 136 FERC ¶ 16,051, available at https://www.ferc.gov/whats-new/comm-meet/2011/072111/E-6.pdf; *see also Transource Pennsylvania, LLC v. DeFrank*, 156 F.4th 351, 362 (3d Cir. 2025). Among other responsibilities, PJM must ensure that the regional transmission system meets all federally approved reliability planning criteria. These planning criteria ensure that the transmission system continues to operate safely and reliably. *See id.* (observing that PJM is "responsible for planning, and for directing or arranging, necessary transmission expansions, additions, and upgrades that will enable [provision of] efficient, reliable and non-discriminatory transmission service.") (citation omitted).

14.    In 2022, PJM identified numerous 500 kV lines within its region that are at risk of violating numerous reliability planning criteria, including the risk of becoming severely overloaded—*i.e.*, transmitting more power than that for which they were designed—in 2027. (Shilkoski Decl. ¶ 9.) Transmission lines at the 500 kV level are a critical part of the region's electric system and allow electricity to flow across states from where power is generated to where it is needed. When a transmission line overloads, the transmission line equipment, which consists of a combination of steel and aluminum, begins to overheat, which, in turn, may render the steel and aluminum brittle and inoperable. (*Id.*)

15.    Under these system conditions, PJM's analysis has observed thousands of voltage collapse violations (the inability of the transmission system to deliver power to load) and extreme low voltage (non-sustainable) violations occurring in 2027 in various areas, including in Maryland. (Shilkoski Decl. ¶ 11.) PJM has concluded that, if these reliability violations are left unaddressed, overall system reliability for Maryland customers and others within PJM's region could be

compromised, which could, in turn, lead to widespread and extreme conditions, including system collapse and blackouts.  (*Id.*)

16.    To that end, on February 24, 2023, PJM opened a competitive planning window to solicit solutions from qualified transmission owners and developers to prevent these reliability violations from occurring. (Shilkoski Decl. ¶ 12.)  In response, PJM received 72 separate proposals from various transmission developers, including proposals submitted by the Company, to address these forecasted reliability violations described in the problem statement contained within PJM's open solicitation.  (*Id.*)

17.    After several months of evaluation, PJM selected the MPRP, as well as several other proposals, to address the looming transmission reliability problems.  (Shilkoski Decl. ¶ 13.) PJM has directed the Company to construct and place the MPRP into service by June 2027 to prevent significant reliability violations to the electric grid.  (*Id.* ¶ 15.)

18.    To commence construction of the MPRP as directed by PJM, the Company must obtain authorization from the PSC.  Maryland law requires that any person seeking to construct an overhead transmission line must obtain a CPCN from the PSC before beginning construction.  *See* Md. Code Ann., Pub. Util. Art. ("PUA") § 7-207(b)(3)(i).

19.    On December 31, 2024, the Company filed a CPCN application with the PSC for an order authorizing the construction of the MPRP. (Shilkoski Decl. ¶ 17.)  Following the issuance of a CPCN, the Company will be authorized by law to proceed with eminent domain cases to acquire the properties necessary to construct the MPRP along the route approved by the PSC in the CPCN.  *See* PUA § 2-702(b)(4)(i)(1).

20.    The Company's CPCN application included testimony from various Company witnesses, an environmental review document ("ERD") prepared by the Company's consultants

that discusses the MPRP's anticipated environmental impacts, and a routing study that identifies the MPRP's proposed route and explains why alternative routes were not selected. (Shilkoski Decl. ¶ 17.) The proposed route traverses the Town's property. (*Id.* ¶ 6.)

21.     To evaluate the Company's CPCN application, the PSC must consider various aspects of the MPRP, including its effect on the environment, conservation of natural resources, and the preservation of natural quality. *See* PUA § 7-207(e); COMAR 20.79.04.04(B); (*see also* Shilkoski Decl. ¶ 18.)

22.     Moreover, PPRP is required by law to coordinate the review and analysis of the Company's CPCN application by certain state agencies including the Maryland Departments of Natural Resources, Environment, Agriculture, Commerce, Planning, and Transportation, as well as the Maryland Energy Administration. *See* Md. Code Ann., NR § 3-303 *et seq*. As part of this review and analysis, PPRP provides the PSC with proposed recommended licensing conditions that address any environmental and socioeconomic impacts of the MPRP. *See* Md. Code Ann., NR § 3-306(b)(1) (requiring PPRP to "complete an independent environmental and socioeconomic project assessment report"); *id.* § 3-306(b)(2) (requiring PPRP to submit proposed licensing conditions); (*see also* Shilkoski Decl. ¶ 19.) After the Company filed its CPCN application, on January 10, 2025, the PSC requested PPRP to report, by March 26, 2025, its recommendation as to whether the application is administratively complete in accordance with COMAR 20.79.01.06. (Shilkoski Decl. ¶ 19.)

23.     PPRP has required the Company to conduct certain on-site, non-invasive environmental tests, surveys, and studies along the proposed Project route in order to inform the State Agencies' evaluation of the environmental and socioeconomic impacts of the Project.

(Shilkoski Decl. ¶ 20, Ex. 5.)  As a result, the Company must conduct wetlands delineations, forest stand delineations, field surveys, and other surveys, as PPRP requires.

24.    As just one example, PPRP has required the Company to provide "field-based" measures of environmental effects related to possible areas of sensitive species of concern.  (*Id.*) Accordingly, to meet PPRP's requirement for "field-based measures of environmental effects," the Company must enter the Town's property to conduct said noninvasive surveys.

25.    As another example, PPRP has required the Company to perform cultural resource surveys that are required by the Maryland Historical Trust to measure "impacts on historical and/or archaeological areas of concern."  (Shilkoski Decl., Ex. 5, at 5.)

26.    On March 26, 2025, pursuant to the PSC's January 10, 2025 request, PPRP advised the PSC that it does not consider the Company's CPCN application to be administratively complete, in part because it "lacks a sufficient summary of the environmental and socioeconomic effects from the construction and operation of the Project, including field studies, which are necessary to meet the requirements of COMAR 20.79.04.04(B) and (C)."  (Shilkoski Decl., Ex. 5 at 1, 4.)  PPRP stated that, without the various surveys that PPRP requested, it "cannot fully evaluate the Project's impacts to Maryland's socioeconomic and natural resources."  (Shilkoski Decl. ¶ 20.)

27.    On September 11, 2025, the PSC entered the Procedural Schedule, which, as described above, establishes the procedures for the review of the Company's application, including obtaining PPRP's requested surveys for PPRP to complete its review.  (Shilkoski Decl., Ex. 8.)

28.    In adopting the deadlines set forth in its Procedural Schedule, the PSC held that the Procedural Schedule "allows PPRP and the Commission to perform the statutory responsibilities prescribed in Maryland law," as PPRP cannot "perform its statutorily required evaluation of [the

Company's] Application . . . without the required field studies," and the PSC "cannot compromise PPRP's ability to conduct its review of the Application." (*See id*.)

29.     Without PPRP and the State Agencies' evaluation and recommendation, the PSC's consideration of the Company's CPCN application cannot move forward to a timely resolution because the PSC cannot issue a CPCN without first giving due consideration to environmental impacts, which PPRP is required by statute to evaluate.  Md. Code Ann., PUA § 7-207(e)(2)-(3); (Shilkoski Decl. ¶¶ 20, 22.)

30.     In that event, the Company will not receive authorization from the PSC to construct the MPRP.  This, in turn, would risk significant disruptions to the electric grid across Maryland and other states within PJM's territory.  (Shilkoski Decl. ¶ 27.)

31.     As a result, if access to the Town's property is not granted, the Company would either be required to abandon the Project or redraw the proposed line for the MPRP and submit a new CPCN application to the Commission to attempt to meet its obligation under the DEA. (Shilkoski Decl. ¶ 28.)  Either scenario would threaten the reliability and stability of the electric transmission system within PJM's territory that includes Maryland.  (*Id*.)    Moreover, if the Company pursued an alternative route, it is likely that the Company would encounter additional opposition with any alternative proposed line based on public comments and correspondence the Company has received to date.  This, in turn, would likely put the Company in exactly the same position in which it finds itself now: seeking Court intervention, pursuant to Maryland law, to permit the Company access.  (*Id*. ¶¶ 28–29.)

32.     The Company would be required to incur significant expenses in such an event. Among other expenses incurred to date that were required to prepare the Company's CPCN application, the Company has spent $6,329,286 through May 2026 in fees to siting and

environmental consultants, who have assisted the Company in analyzing numerous specific properties through available public data and assessing the feasibility of the properties for a high voltage transmission line as well as the impact of the line on sensitive environmental areas for the purpose of identifying a proposed route that is designed to both function effectively and minimize the scope of environmental impacts as much as possible.  (Shilkoski Decl. ¶ 29.)  The Company has also spent $4,992,979 through May 2026 in fees to a real estate firm that has assisted, among other things, with contacting property owners to gain access for surveying purposes.  (*Id*.)  To prepare a new application that would reflect a new proposed route, the Petitioner would be required to again incur these fees, in addition to significant legal fees and the cost of time spent by PSEG Services Corporation and its employees.  (*Id*.)

33.     Alternatively, if access to the Town's property is not granted and the Company does not receive authorization from the PSC to construct the MPRP, then the Company will be unable to comply with its obligations under the DEA and to construct the transmission line, in breach of the DEA.  (Shilkoski Decl., Ex. 1.)   In this instance—if the MPRP does not move forward—then the Company will lose significant revenue it would have generated from placing the MPRP in service.  (Shilkoski Decl. ¶ 30.)

34.     To avoid these results, the Company must be able to enter the Town's property to complete the surveys PPRP has identified.  (Shilkoski Decl. ¶¶ 26–27.)  And, given the time it will take the Company to conduct the required surveys, the Company must be able to do so immediately.  (*Id*.)

35.     The Company has been denied entry by the Town to conduct the requisite surveys. (Shilkoski Decl. ¶ 38.)

36.     As a result, the Company seeks an order from this Court pursuant to RP § 12-111 that permits the Company to access the Town's property until the date that the PSC issues a decision on the CPCN to the Company so that the Company may perform the studies and provide the environmental information about the Town's property that PPRP states it requires as part of its review and evaluation of the Company's CPCN application.

## This Court Previously Granted The Company Preliminary Injunctions Pursuant To RP § 12-111 Against Other Property Owners

37.     The Company first sought an order pursuant to RP § 12-111 from this Court on April 15, 2025, when it filed a petition against 117 property owners who had refused to allow temporary access to their properties for the Company to conduct surveys required by PPRP, despite the Company's real and bona fide efforts to notify those landowners and seek their permission for entry. *See PSEG Renewable Transmission LLC v. Arentz Fam.*, *LP*, 788 F.Supp.3d 705, 725 (D. Md. 2025) ("*PSEG 1*").  The same day, the Company moved for a preliminary injunction to prevent the property owners from interfering with its statutory right of access to conduct noninvasive surveys. *Id*.

38.     Most respondents in *PSEG 1* filed motions to dismiss the petition and briefs in opposition to the motion for a preliminary injunction. *Id.*

39.     The Court held a hearing on the Company's motion for preliminary injunction and the respondents' motions to dismiss on May 19, 2025.

40.     On June 20, 2025, the Court granted the Company's motion for a preliminary injunction and denied all motions to dismiss. *Id.* at 740-41.  In addition to rejecting the arguments for dismissal, the Court held that (1) the Company had made a strong showing that it was likely to succeed on the merits of its claim that it was entitled to enter the properties to conduct noninvasive surveys pursuant to RP § 12-111, *id.* at 735-37; (2) the Company was likely to suffer irreparable

injury in the absence of a preliminary injunction in the form of delay costs and lost revenue, *id.* at *737-39; (3) that the balance of equities favored the Company given that the studies sought to be conducted would be minimally invasive, the Company's statutory right of entry was temporary rather than permanent, and the respondents could obtain damages in the event of any damage, *id.* at 739-40; and (4) preliminary relief was in the public interest because PPRP had determined the studies were necessary in order for PPRP to discharge its statutory duties, and the court would not second-guess PPRP's determination that the studies were necessary, *id.* at 740.

41.    The Court issued a preliminary injunction requiring that, from June 20, 2025 until the Company's CPCN application is granted or denied, the respondents permit the Company to enter and remain on the properties to the extent reasonably necessary to conduct the noninvasive surveys as authorized by RP § 12-111.  The *PSEG 1* Preliminary Injunction also requires the Company to provide at least 24 hours' notice to property owners before entering their property to conduct surveys, though only one notice is required for entry on multiple days.

42.    On July 15, 2025, the Company sought a second order from this Court authorizing the Company to enter additional properties owned by landowners who refused the Company access.  *See PSEG Renewable Transmission LLC v. Alvi Properties, LLC, et al.*, Case No. 1:25-cv-02296-ABA (*"PSEG 2"*), Dkt No. 1 (Jul. 15, 2025).  The same day, and just as in *PSEG 1*, the Company moved for a preliminary injunction to prevent the property owners from interfering with its statutory right of access to conduct noninvasive surveys.  *See PSEG 2*, Dkt. No. 124.

43.    Certain respondents in *PSEG 2* moved to dismiss the action and opposed the Company's motion for preliminary injunction.  *See PSEG 2*, Dkt Nos. 143, 144.  On September 2, 2025, the Court granted the Company's motion for preliminary injunction and denied the respondents' motion to dismiss "[f]or the reasons explained in the Court's June 20, 2025

memorandum opinion in *PSEG 1*[.]"  *PSEG 2*, Dkt. No. 156 at 1.

44.  On October 9, 2025, the Company sought a third order from this Court authorizing the Company to enter additional properties owned by landowners who also refused the Company access. *See PSEG Renewable Transmission LLC v. Belfast Farms, LLC, et al.*, Case No. 1:25-cv-03352-ABA ("*PSEG 3*"), Dkt No. 1 (Oct. 9, 2025).  The same day, and as in *PSEG 1* and *PSEG 2*, the Company moved for a preliminary injunction to prevent the property owners from interfering with its statutory right of access to conduct noninvasive surveys. *See PSEG 3*, Dkt. No. 65.

45.  Certain respondents in *PSEG 3* moved to dismiss the action and opposed the Company's motion for preliminary injunction. *See PSEG 3*, Dkt. Nos. 88, 90.  This Court heard argument on the Company's preliminary injunction motion and respondents' motion to dismiss on November 25, 2025.  At the conclusion of argument, the Court orally granted the Company's motion for preliminary injunction and denied the respondents' motion to dismiss.  On December 19, 2025, the Court entered a preliminary injunction. *See PSEG 3*, Dkt. No. 112.  The same day, the Court amended the Preliminary Injunctions in *PSEG 1* and *PSEG 2* to reflect the Preliminary Injunction entered in *PSEG 3*. *See PSEG 2*, Dkt. No. 203.

46.  Finally, on February 25, 2026, the Company sought a fourth order from this Court authorizing the Company to enter additional properties owned by landowners who also refused the Company access, as well as properties where Carroll County holds a conservation easement. *See PSEG Renewable Transmission LLC v. The Richard Smith Snader Testamentary Trust, et al.*, Case No. 1:26-cv-00793-ABA ("*PSEG 4*"), Dkt No. 1 (Feb. 25, 2026).  The same day, and as in the prior cases, the Company moved for a preliminary injunction to prevent the property owners from interfering with its statutory right of access to conduct noninvasive surveys. *See PSEG 4*, Dkt. No. 3.  On April 22, 2026, the Court entered a preliminary injunction against all respondents in

*PSEG 4* besides Carroll County. *See PSEG 4*, Dkt. 46. The Company's motion for preliminary injunction remains pending as to Carroll County. *See PSEG 4*, Dkt. 45.

## RP § 12-111 Authorizes Entities With Condemnation Authority To Enter Private Property To Conduct Surveys

47.     RP § 12-111(a) provides that civil engineers, land surveyors, real estate appraisers (and their assistants) acting on behalf of "any body politic or corporate having the power of eminent domain," after having made every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry, may:

> (1)     Enter on any private land to make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report, undertaking, or improvement;

> (2)     Set stakes, markers, monuments, or other suitable landmarks or reference points where necessary; and

> (3)     Enter on any private land and perform any function necessary to appraise the property.

48.     Further, RP § 12-111(c) states that, if any civil engineer, surveyor, real estate appraiser (or their assistants) is refused permission to enter onto a property to conduct a survey or study permitted by RP § 12-111(a), the legal entity may apply to "a law court of the county where the property, or any part of it, is located" for an order authorizing entry onto the property.

49.     RP § 12-111 does not afford the owner or occupant an opportunity for a hearing prior to the issuance of an order under RP § 12-111. *King v. Mayor and City Council of Rockville*, 52 Md. App. 113, 120–23 (1982) (holding that landowners were not entitled to a hearing prior to issuance of order granting governmental agency access to survey their land pursuant to RP § 12-111), *cert. denied*, 294 Md. 442 (1982), *cert. denied*, 461 U.S. 914 (1983); *see also Transource Maryland, LLC v. Scott, et al.*, Case No. 12-C-18-00059 (Harford Cnty. Cir. Ct. June 24, 2018) (issuing order pursuant to RP § 12-111 permitting utility to access private land for surveying

14

purposes and noting that "[i]t is not a violation of due process for this court to proceed without a hearing" (citing *King*, 52 Md. App. at 123)) (attached hereto as **Exhibit 1**).

50.     Accordingly, this Court may issue an Order authorizing the Company entry onto the Town's property without the need for a hearing prior to the issuance of the Order, so long as the Company (1) is a "body politic or corporate having the power of eminent domain," and (2) has "made every real and bona fide effort to notify" the Town of the Company's need to enter their property.

### The Company Is A "Body Politic Or Corporate Having The Power Of Eminent Domain"

51.     The Company is legally entitled to enter the Town's property because it is a "body politic or corporate" that has the "power of eminent domain" within the meaning of RP § 12-111(a).

52.     PUA § 7-207(b)(3)(iii)(2) authorizes the PSC to issue a CPCN authorizing the construction and operation of a high-voltage transmission line to an applicant that "is or, on the start of commercial operation of the overhead transmission line, will be subject to regulation as a public utility by an officer or an agency of the United States."  As noted above, PUA § 7-207(b)(3)(v)(2) further permits these "public utilit[ies]" to exercise condemnation authority to construct transmission lines once they receive a CPCN.

53.     Based on specific findings in the DEA approved by FERC, at the time that the MPRP goes in service, the Company will be a public utility regulated by FERC.  (Shilkoski Decl. ¶ 16.)  Thus, as a matter of Maryland law, the Company is authorized and qualified to apply for a CPCN and to exercise condemnation authority to construct the Project once the CPCN is obtained. Accordingly, under RP § 12-111(a), the Company is a "body corporate" with the "power of eminent domain" and, as such, it is legally entitled to enter the Town's property to survey and

obtain necessary information for its ultimate acquisition of property by eminent domain. The issuance of a CPCN, however, is a condition precedent to a public utility exercising the power of eminent domain.

54. Notably, RP § 12-111(a) does not mandate that all conditions to a condemning authority's actual exercise of eminent domain be satisfied before the condemning authority can conduct surveys or obtain information. Rather, RP § 12-111(a) contemplates that a condemning authority may enter onto land to make surveys or obtain information for the purpose of exercising eminent domain.

55. RP § 12-111(a) does not require the Company to wait to enter the Town's property until after its CPCN is issued. Such an interpretation would render the CPCN requirements under Maryland law unworkable, unreasonable, and impossible to implement. As explained above, PUA § 7-207 requires the PSC to review CPCN applications for, among other things, the environmental and socioeconomic effects of a proposed transmission line of the impacted property and adjacent properties.

56. Moreover, NR § 3-306 requires PPRP, on behalf of the State Agencies, to complete an environmental and socioeconomic project assessment and propose licensing conditions supporting the same. RP § 12-111 permits surveys "for any governmental report, undertaking, or improvement." Because the Commission is requiring the Company to provide surveys for all properties in ROW so that PPRP can, in turn, "perform its statutorily required evaluation of the [Company's] Application," the surveys the Company seeks are the type of survey authorized by the plain language of the statute.[1] (Shilkoski Decl., Ex. 8).

---

[1] Moreover, the Company's interpretation of RP § 12-111 conforms with longstanding Maryland precedent that has regarded temporary rights of entry prior to condemnation as constitutionally permissible. *See Lafontaine's Heirs v. Lafontaine's Heirs*, 205 Md. 311, 320 (1954) ("Authorized temporary occupancy or momentary entry for purposes of survey or inspection is not a taking and may be done without compensation."); *Steuart v. Baltimore*, 7 Md. 500, 516

16

57.     In sum, because the Company is authorized and qualified to apply for a CPCN to construct a transmission line and to exercise condemnation authority to construct the Project pursuant to PUA § 7-207, it is a "body politic or corporate" with the "power of eminent domain" within the meaning of RP § 12-111(a).

**The Company Has Made Every Real And Bona Fide Effort, Including Requests In Writing, To Obtain The Town's Consent to Enter Its Properties For The Purpose Of Taking Field And Environmental Surveys**

58.     As set forth in the accompanying Declaration Dawn Shilkoski, the Company has made numerous real and bona fide efforts to obtain the Town's consent so that the Company may enter onto their property for the purpose of taking surveys and obtaining information.  Despite these real and bona fide attempts, the Town has refused consent for the Company to enter its property.  Indeed, the Town has filed a lawsuit seeking an injunction to prohibit the Company and its agents from entering its property to conducts surveys.  Dkt. 1-1.

## CLAIM FOR RELIEF

### Count I: Injunctive Relief (RP § 12-111)

59.     The Company incorporates by reference each allegation contained in the preceding paragraphs as if set forth fully herein.

60.     RP § 12-111 permits "civil engineers, land surveyors, real estate appraisers, and their assistants acting on behalf of . . . any body politic or corporate having the power of eminent domain" to enter on private land to "make surveys, run lines or levels, or obtain information relating to the acquisition or future public use of the property or for any governmental report,

---

(1855) ("The constitutional prohibition against taking private property for public use, until compensation is first paid or tendered, means taking the property from the owner, and actually applying it to the use of the public.  It does not mean the preliminary measures necessary in such cases.  To hold that compensation must be paid or tendered, before a survey should be made, or other preparatory steps taken, would be a construction of the constitution not required by its language, or necessary for the protection of private rights.").

undertaking, or improvement," so long as the entity seeking entry has made "every real and bona fide effort to notify the owner or occupant in writing with respect to the proposed entry."  RP § 12-111(a).

61.     The Company is a "body politic or corporate having the power of eminent domain," as contemplated by RP § 12-111(a).

62.     The Company requires entry to the Town's property to perform surveys and gather information to obtain a CPCN that will, in turn, permit the Company to construct the Project along the Town's property.

63.     The Company has made every real and bona fide effort in writing to notify the Town of the Company's need to enter the Town's property.

64.     The Town has nonetheless refused permission to the Company.

65.     Because the Town has not given the Company consent to enter their property, RP § 12-111(b) permits the Company to seek an order directing that they "be permitted to enter on and remain on" the Town's property "to the extent necessary to carry out" the requisite surveys and information gathering for the Company's CPCN application.

66.     Accordingly, the Company is entitled to an order that permits the Company to enter the Town's property for the purpose of conducting the surveys and gathering the information required by PPRP.

## PRAYER FOR RELIEF

WHEREFORE, PSEG Renewable Transmission respectfully requests that the Court:

A.      Enter an order pursuant to RP § 12-111 that:

18

    a. Permits PSEG Renewable Transmission LLC to enter the Town's property through the date that the PSC issues a CPCN to PSEG Renewable Transmission for the purpose of conducting any required surveys; and

    b. Temporarily and permanently enjoins the Town from interfering with PSEG Renewable Transmission's access to the Town's property; and

B.    Order such other and further relief as this Court deems just, proper, and equitable.

June 9, 2026

Respectfully submitted,

*/s/ Kurt J. Fischer*_____
Kurt J. Fischer (Bar No. 03300)
VENABLE LLP
210 W. Pennsylvania Avenue, Suite 500
Towson, Maryland 21204
(410) 494.6200
(410) 821-0147 (facsimile)
kjfischer@venable.com

J. Joseph Curran III (Bar No. 22710)
Christopher S. Gunderson (Bar No. 27323)
Kenneth L. Thompson (Bar No. 03630)
Susan R. Schipper (Bar No. 19640)
Emily J. Wilson (Bar No. 20780)
Venable LLP
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
(410) 244-7400
jcurran@venable.com
csgunderson@venable.com
klthompson@venable.com
srschipper@venable.com
ejwilson@venable.com

*Attorneys for Defendant/Counter-Petitioner*
*PSEG Renewable Transmission LLC*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 9th day of June, 2026, a copy of the foregoing was served

on:

Michelle M. Ostrander
Town Attorney for the Town of New Windsor
741 Windsor Drive
Westminster, MD 21158
410-848-3404
Mostrander133@gmail.com

Timothy F. Maloney
tmaloney@jgllaw.com
Kaitlin E. Leary
kleary@jgllaw.com
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301-220-2200

*Counsel for Plaintiff*

*/s/ Emily J. Wilson*
Emily J. Wilson